Case number 16-1093 et al. Kansas Corporation Commission Petitioner v. Federal Energy Regulatory Commission. Mr. Gray for the petitioner. Mr. Mitchell and Nathan for the respondent. Mr. Gray, good morning. Good morning, your honors. May it please the court, my name is Jason Gray from the law firm of Duncan Weinberg, Ginzer and Pembroke. I'm appearing this morning on behalf of the petitioner, Kansas Corporation Commission, a state agency that among other things is charged with representing the interests of wholesale transmission customers in Kansas and proceedings before the respondent, FERC. With the court's permission, I would like to reserve three minutes of my time for rebuttal. Although FERC questions the court's jurisdiction to hear this appeal, I will focus first on the merits arguments before squarely addressing those challenges because the substantive findings in the challenge orders demonstrate precisely why the Kansas Commission has standing and why this appeal is right for adjudication. That is, the very purpose of the findings the Kansas Commission is challenging was to under Federal Power Act Section 205 and of entities like the Kansas Commission under Federal Power Act 206. And the definitive effect of those legal determinations is the imposition of the Section 206 burden of proof on the Kansas Commission. But is it still at least conceptually possible that you would acknowledge that even though the Commission resolved those claims that there still would be a lack of standing? I don't think so because I don't think there's any outstanding factual issue here. The issue is purely a legal determination. And that legal determination involves the burden of proof under Sections 205 and 206. Those determinations have been made. So at any future proceeding, the Kansas Commission would not have the opportunity to challenge those determinations. This appeal is the only opportunity. If there is a proceeding. If there is a proceeding, that's exactly correct. But that's a factual determination. No, whether there's a proceeding is just an uncertain future condition. Exactly. But the legal standard has already been decided in these orders that would apply if there if there is a proceeding. And we would not have an opportunity outside of this appeal to challenge. But if we don't even know, suppose that we have no idea whether there's going to be a proceeding, then we have no idea whether there's going to be any concrete joinder of these issues in a in a cognizable controversy. And if that's true, that's typically a situation in which we say either that there's not standing or that the or that the circumstances haven't ripened to the sort of dispute that we resolve. Certainly. And I think if the court looks at the LSP transmission case, which FERC highlighted for the court in its October 30th Rule 28 J letter in discussing injury in fact and concrete harm, that case makes clear that the petitioner in that case was not harmed because there was no determination of legal rights and there was no imposition of a legal burden on the petitioner. And here we have both of those things. The determination of legal rights was under both sections 205 and 206, as I mentioned. And then the imposition of the burden of proof is on the Kansas Commission. And those were final determinations. There's no opportunity outside of this appeal to challenge those determinations in the future or to seek relief from what the Kansas Commission views as FERC's misallocation of the burden of proof. Well, first of all, I said whether there'll be a proceeding, but whether there's a proceeding depends upon a number of intermediate steps, including a determination to object to the application of the formula rate in that and therefore bring a proceeding, right? And there may or may not be any objection. Well, and I think that's an important distinction. So the way the request was proposed before is that FERC would pre-approve this formula rate, including the base return on equity, and then the not yet formed affiliates could replicate or adopt that formula rate in the future. And that adoption or replication would take place in what's essentially a ministerial section 205 filing, not a substantive section 205 filing. So whether the rate coincidentally turns out to be just and reasonable, whether the Kansas Commission has a question about the rate, those types of questions are really one step removed from the threshold question that is on appeal. And it's whether those types of questions must be addressed in the first instance in a section 205 filing where the public utilities bear the burden of proof or a section 206 proceeding where the Kansas Commission bears the burden of proof. One step removed. I mean, it's a step beyond, right? There's no burden of proof issue unless there's an objection to the application of the rate of return to the possibly changed circumstances. That may be the case. It may turn out that there is no issue, but the legal determination if there is an issue... But there's a legal determination with no consequence if there's no subsequent issue and proceeding, correct? It's a legal determination. I mean, it's really a determination. The determination they've made, that the FERC made, has the consequence that you're shifted to a 206 proceeding. They didn't say, henceforth, or maybe they said it doesn't matter, henceforth you must proceed under 206, but it's obviously the consequence of the action that they took here. So, but that consequence is of no moment until there's an issue raised. When was this decision made by the FERC? The orders on re-hearing were issued in 2016. And the original order? The original orders were both in 2015, I believe. 2015, okay. Any subsidiaries formed or activity taken by subsidiaries of the companies involved so far? I'm not aware of whether any of the NIAF form affiliates have, in fact, been formed. I know that there was one project which these entities are formed to bid on, hopefully to construct. So, I mean, they have to be formed in order to bid, and then they have to win the bid, and then they have to be, and then there has to be a grievance by the commission over the rate of return. All those things are conditions that have not yet been fulfilled. And that's exactly the issue here. So the issue, we really don't disagree on the standards governing standing and rightness. The issue is really whether the harm is actual, imminent, and concrete. Because it sounds like your argument then, it sounds like your argument in response to what Judge Ginsburg is raising is that even if you grant that every one of those contingencies exists, and even if we knew to a moral certainty right now that none of them would come to pass, and so that we didn't have a subsequent proceeding at all, you'd still be saying that there's both standing and rightness with respect to your current challenge. Exactly, because the determinations are legal and they have been made. How is this not an advisory opinion that you're seeking? I think it potentially could have been, but if you look at the language in the orders, FERC makes clear it is pre-approving formula rate treatment. It is predetermining its Section 205A obligation. It's actually abdicating that obligation that it will not make a Section 205A determination in the future, because it's predetermined justice and reasonableness. It is predetermined that the not yet formed affiliates will not bear the burden of proof under Section 205A. I guess your argument's even broader than I thought it was going to be, because I thought when we came in here, the issue was going to be whether there's a sufficient likelihood that there's going to be a subsequent proceeding such that you'd have standing and rightness now. But your argument now is that even if there's a complete unlikelihood that there will be a subsequent proceeding, there's still standing and rightness now, which seems puzzling to me, because then the formula rate is just an abstraction. It's never going to be visited on anyone. And if the formula rate is never visited on anyone, actually, then what's the concrete harm that would give us the kind of injury in fact predicate that we need to resolve a concrete dispute, instead of just deciding what amounts to, it seems to me, a complete abstraction? Certainly, Your Honor, and it's actually both of those things. We're trying to, on the one hand, address the worst-case scenario from our perspective in terms of standing and rightness, which would be none of these events actually occur. Which also may be not so good for you, the best-case scenario for purposes of consumers, because then the formula rate is never actually applied. Exactly. So if that's the case, and we have none of those facts going for us, we still think there is standing and rightness here, because these are final legal determinations. But I don't think it's reasonable to assume these facts will never occur. These entities are being formed in order to build the Order 1000 projects. Order 1000 study processes are going forward. The very purpose of these determinations was based on the assumption that there's at least a high likelihood that this process will occur. Mr. Gray, just before you answered this question, you mentioned, I think it was the formula from the Defenders of Wildlife v. Lujan case about imminence and so on. What was the phrase that you used? I was referring to the LSP transmission case. Whatever you recall. Actual imminent and concrete harm. Okay, actual imminent and concrete. Here's your brief at 35. The record reflects a complete lack of certainty as to when a trans-source SPP entity or MPTR entity, SPP entity, will be formed. So you have something imminent and actual, but completely uncertain. Well, I think one distinction there, it's a timing issue. There's no record evidence as to when the affiliate will be formed, but the very purpose of the findings we are challenging is to determine the legal rights that will be in effect when those entities are formed. So we're not saying there's uncertainty that they ever will be. We recognize that's potentially the case, but the very reason this filing was made and these determinations were made by Respondent Ferg was to address that potential that these entities would be formed. Let me ask you a question which is on the merits but reflects on this. As I understand it, from the little outcroppings I found in the record and in your brief, I think, the incumbent companies already have these shelf filings. In other words, the same kind of template rate that's been approved by the Kansas Commission. By Respondent Ferg. Yeah, okay. And so what's the experience been with them? Have they, in fact, relied on those filings for some new project? Certainly. I beg your indulgence just to back up one step before I directly respond to that question. So the experience with the two entities that have formula rates approved, TransSource Kansas and CanStar, is that they were the applicants in the FERC proceedings below. They complied with Section 205. They submitted substantive filings that demonstrated in the first instance the justness and reasonableness of the formula rates, including the returns on equity. And the joint appendix in this appeal, these are only excerpts, but contains over 350 pages of documentation they provided in support of their efforts to meet their burden of proof. On just the issue of cost of capital and return on equity alone. You're going into a lot of detail about the, is this the FERC proceeding? Yes. Okay. What I want to know is, at the Kansas Commission, where you've approved and the FERC has approved these standby filings, whatever we're going to call them, for incumbent providers, incumbent companies, what has the experience been with those companies? Have they used the rates? Have they created new subsidiaries? Certainly. In the proceedings below, and I apologize, I was trying to provide some context to get to the preapproval and then the current experience. In the proceedings below, there's only been one project in SPP. It was not won by any of these incumbents, and that project was actually canceled. In other proceedings, and in particular the one that FERC supplied the court in its November 3rd Rule 28J letter, which was a California independent system operator proceeding, which is the California equivalent of the Southwest Power Pool here, there is a live project, and that entity is going forward. So in the Southwest Power Pool, where the entities, TransSource Kansas and CanStar and its affiliates are, there has not been a live project yet. That's an annual study process. Not been won for anyone, not just these two companies, but for the incumbent providers. That's correct. There's not been one for anyone. There was one project, but it was canceled. If the incumbent providers now were to, if one of them were to win the right to service a new area, they would file the rate that's already been preapproved, correct? Exactly. And what would be your burden in objecting to it? So if I understand your question, say TransSource Kansas is one of the entities that submitted the Section 205 filing, won a project, and then sought to implement the rate that's been preapproved. The Kansas Commission in that case rightfully would bear the Section 206 burden because the two-part structure of the Federal Power Act provides that it is only after a rate is lawfully determined under Section 205, which is the case for TransSource Kansas and CanStar, then the burden shifts to an entity like the Kansas Commission. How is it different from the situation of the companies in this case? It's different from the not-yet-formed affiliates because those not-yet-formed affiliates, inherent in the fact that they do not yet exist, have never submitted a substantive Section 205 filing. And so FERC's findings below as to why that's not necessary, which we think are a legal issue that the Federal Power Act plainly requires it, but the factual findings below as to why that's not necessary is that these not-yet-formed affiliates will have the same parent companies and purpose as TransSource Kansas and CanStar, and therefore there's no need. I'm confused about this, and I apologize if it should be clear, but I'm finding it difficult. Let me go back and just clarify this. There are certain companies that have been authorized by the Kansas Commission to invoke a rate of subsequent time. By the respondent FERC has made that authorization, yes. Okay, the respondent FERC has made that authorization. And have any incumbent companies used that authority? No, not incumbents or non-incumbents. And did you object when the incumbents sought that authority that was approved by the FERC? Let me give you a two-part answer. We did not object to the request to seek the rate preapproval. We objected to components of the rate preapproval. And that's the distinction, really. This is not a rate proceeding. And were you heard by the FERC? We were heard, and that's the type of process. How did they accept your position? They did accept our position. And as I was explaining, TransSource Kansas and CanStar submitted voluminous data demonstrating trying to meet their burden of proof on just the cost of capital and equity, return on equity issues. They submitted 84 pages of expert witness testimony, one entity, and 79 pages of the other with many supporting exhibits. And FERC still found that they did not meet their Section 205E burden, consistent with the Kansas Commission's protest, and set that issue for hearing so there was additional process. And the returns on equity that were ultimately approved were a result of a settlement as part of that additional process. With the not yet formed affiliates, we don't have any of that. We don't have a filing. We don't have a process. FERC has predetermined that at whatever time in the future those affiliates are formed, it will be just and reasonable for them to charge the same rates that were preapproved for TransSource Kansas and CanStar. And any question about whether those rates actually are just and reasonable, either at the time those entities are formed or based on the specific facts unique to those entities, will be determined under Section 206. All right. We'll give you a couple of minutes in reply. Thank you. Mr. Viswanathan. Good morning. Anand Viswanathan for the Commission. So there's been a number of questions about the standing and rightness issues. Just to be clear, I think the panel seems to get that none of these entities, whether the existing ones, TransSource, CanStar, or any of their unformed affiliates will be able to actually implement the formula rates approved by the Commission unless and until one of these entities is actually awarded a transmission project in the Southwest Power Pool competitive solicitation process. And at this point in time, that is still an uncertain proposition. Since the order is on review and since the petition has been filed, no project has been awarded to any of these entities. I understand that Kansas — Do the entities exist? So CanStar, I believe, has three existing entities. And my understanding is that TransSource does not yet have any existing entities. Council of our interviewers can probably shed some light on whether that's changed since the close of the record. But regardless of whether the entities exist or not, the concern that Kansas raises is one of the rates that are approved and the orders on review may not be current if and when a project is actually awarded to one of these entities. Well, that's a problem that applies to all of these entities because for all we know, a yet-to-be-formed affiliate can be the first one to actually win a project. And the existing entities may never win a project. We just don't know. And what this Court has said in a number of cases is regardless of whether any legal determinations were made by the Commission, there still needs to be an injury, a concrete injury, flowing from those determinations. And both LSP and, I believe, the New York Regional Interconnect case involve a similar factual context of the bidding process for transmission projects in a regional entity. And in both of those cases, there were no active proposals, and so there was no imminent threat of harm from the orders on review. And that's the exact situation we're in now. I'll also point out on this idea of the legal determinations, there's been a number of decisions from this Court that have stated that precedential effect within the agency, if it's unmoored from any actual harm or injury from the substance of the orders, is not enough to confer standing. So they still have to show a concrete or at least imminent threat of standing, imminent threat of injury, and they don't have the ability to do that. One point I'd like to add is that Kansas hasn't really disputed the practical considerations behind the Commission's orders. The record before the Commission reflected that there is a limited amount of time between when the Southwest Power Pool actually announces a project and the time in which bids are due for that project. And so the record before the Commission reflected that these entities could not wait until a project had been announced before they submit an application to the Commission, which is why they submitted all of their applications in advance of that bidding window. That's something the Commission has approved prior to the orders on review. It's approved that since the orders on review. And the reason for that is that these are all non-incumbent transmission developers who don't have existing mechanisms to recover costs in the way that incumbent transmission owners would. And so the Commission found and it agreed with the filing parties that these entities need to be able to have those approvals prior to the start of that bidding window so they could put together the most competitive bids possible and put themselves in a position to actually run a project. One other point that was raised, the ability of entities like Kansas to actually challenge in the future, challenge these rate determinations in the future, they absolutely have the ability to challenge them. The Commission made clear in the orders on review that they can bring a complaint under Section 206 of the Federal Power Act. The Commission can also itself investigate whether the rates, if they are to be paid in the future, are actually just and reasonable. And this Court has held on a couple different occasions that Section 206 is a sufficient remedy under the statute to ensure that rates are actually just and reasonable. When you just said that the Commission can itself determine whether the rates are going to be just and reasonable on a going forward basis, that's under 205 or that's under 206? That's under 206. Yeah. So the Commission can investigate whether at some future point in time if one of these entities attempts to implement a rate, the Commission can itself initiate an investigation. So there definitely is an opportunity to challenge the application of the formula in the future, but it's also definitely true that the challenge is going to be under 206 rather than 205. I think that's right. I mean, I think what the Commission stated in the orders is that it didn't see the need to re-litigate the justice and reasonableness of the rate request with respect to the yet-to-be-formed affiliates because of the fact that they were seeking, the filing parties were seeking approval for those yet-to-be-formed affiliates to use the identical rate that they were presenting to the Commission. And so because of the fact that it was the exact same rate, these are entities operating in the same corporate family. They're formed for the same purpose. They're participating in the same regional competitive solicitation process. The Commission didn't see the need to re-litigate that in a future proceeding, but it did clarify that 206 is available to challenge rates as needed in the future. Can I ask you about your PJM subsequent holding and the 205 similar situated? How do you intend to use that? Would that apply to Kansas? Well, I think you're referring to the PJM order that the Commission issued this year. Right. And that relates to entities operating in a different regional entity. I think that was the PJM entity. And we've also submitted a different order from, I think, a month ago where the Commission, that was another regional entity where the Commission took the same approach in terms of yet-to-be-formed affiliates and what they need to show in the future as it did in the Orders on Review. I think to the extent there's any confusion about the PJM order because most of what's in the PJM order really tracks the language of what's in the Orders on Review. I understand there is that phrase to the effect of clarifying the future affiliates. I thought there was an additional 205 future filing. Yes. And so I think that's what the PJM order said, which is that future affiliates, when they actually want to implement a rate, they have to come forward with another 205 filing to demonstrate the justice and reasonableness. And are you saying that does not apply to this particular power pool or what? It does not apply, no. Because the Orders on Review were about entities operating in a different region, which is the southwest power pool. I know, but why is that RTO any different from any other? So, I mean, it's a different regional entity. I don't really have a good explanation for why that particular order seemed to take a different approach than all the other Commission orders on the issue of yet-to-be-formed affiliates using formula rates in the future. It does appear to be an outlier in that respect. I mean, one sort of internally inconsistent point about that PJM order is that it has the exact same language as the Orders on Review in terms of not seeing a need to relitigate the justice and reasonableness of rates for use by a future affiliate, but then you think of the next paragraph, they say we clarify that the future affiliates have to submit their own 205 filings. I mean, I'll just add what we stated in our letter to this Court, which is that these are subsequent orders, so they wouldn't necessarily undermine the reasonableness of what the Commission did in the Orders on Review. Kansas hasn't really pointed to any inconsistency in Commission precedent prior to the Orders on Review, so I don't think the PJM order should undermine the Orders on Review. And you also may not be able to say this. You also can't tell us whether that's going to be a clarification that applies to this particular power pool. Well, I mean, the Orders on Review did not include that clarification, so we know that it doesn't apply to Southwest Power Pool. I don't really have a good answer for why that language is inserted into orders regarding a different regional entity. It does appear to be an outlier. The Desert Link order that we submitted from last month is a different regional entity, and that sort of takes the same track as Orders on Review. Thank you. I'm happy to answer any other questions as to the merits. Otherwise, I'll just submit. All right. Thank you. Thank you. Mr. Ross? Good morning, and may it please the Court. Stephen Ross for the interveners. Following up on Judge Ginsburg's point, one point that was kind of glided over a little bit here was the main benefit to the interveners and the Commission's orders is that our clients can now fill out the templates that allow us to participate fully in the next SPP competitive process. If we did not have the ability to do that, and as Counsel for Frick said that the timing otherwise would not permit, we would lose, as the record shows, we would lose significant points on the scoring and not participate likely. And the Kansas Commission has never indicated why that is a harm to its state ratepayers for us to be in those competitive auctions What it does is allow an additional competitor to be in play, which the more competitors, the more downward pressure on prices, and that can only be a benefit to the Kansas consumers. Also, the only time that our clients will come back before the Commission in the Section 205 case to move these rates into the SPP tariff is if we won the bid. And if we won the bid, that means that SPP determined at the time that our bid was the best bid among all the competitor bids. And the record in the cases to date in competitive auctions throughout the country have indicated that most bidders are now submitting bid concessions, lower returns, cost caps, other cost containments. We have no idea whether if we did win the bid, if our clients did win the bid, we would in fact ask for the same ROE that was approved for CanStar. It may be that the competitive pressures would not permit us to seek an ROE that high. And we'll come in with our filing, we'll show the bid that won, and the Kansas Commission will have an opportunity to demonstrate why even though the SPP determined that our bid was the best bid, why even that rate was unjust and reasonable. And our view is they'll have a full opportunity at that time to contest the justice and reasonableness. As to the point about the incumbents, I think that's a very important point, is that those incumbent returns on equities and rates, they could have been determined in orders that predated the Commission's orders in CanStar and TransSource. And the Kansas Commission has never raised a concern that the ROEs that were approved there could be three, four years older than our ROEs. The fact of the matter is that's how rate making works. You take a snapshot of the ROE at the time of the market conditions, which is what we did, and that ROE stays in place unless and until it's changed. I'm asking you to repeat that, if you would. The incumbents did what three or four years ago? The ROEs that the incumbents had approved by FERC could be in orders that are older than TransSource orders. So the record in that case could be even older than the TransSource orders. So by the time they went through that... But there also would result, at some later time, if there was a proceeding, in putting the KCC to a 206 burden. It may well be that the KCC and the Commission decides, based on the KCC's evidence, that either our client or the incumbents did not meet their burden under Section 205. I think we just don't know how the Commission will rule on that. It may be that we argue that they should rely on the orders from 2015 and 2016. The Commission may choose not to do that. I think the other point is that Council for... My last point is Council for the Commission said that there was no evidence submitted for the new affiliates. The fact of the matter is, as he demonstrated, there was a lot of market-kept evidence that was used to set the returns for the two interveners in this case, and the Commission found, as it needed to, that the analysis the Commission would have used for the affiliates would have been identical. It was the same market-kept data that would have been used to set it. So if we would have filed 14 applications and burdened the record with 14 identical filings, the ROE determination and the underlying analysis would have been identical. Thank you. All right. Does Mr. Gray have any time? All right. Why don't you take two minutes? And please, in your two minutes, address the situation of the incumbents. Certainly. And I just want to make four brief points, and I'll start with that issue of the incumbents. I believe Council for the joint interveners just stated entities that have filed under Section 205 and have rates approved, those rates may change over time, and that's exactly how rate-making works, and that's what we did. I don't know who the we in that context was, if it was intended to be the not-yet-formed affiliates, because they did not submit Section 205 filings. So the fact that a rate may change over time once FERC affirmatively found it to be just and reasonable, that's how the Federal Power Act works. But by presuming that a rate established for someone else is just and reasonable and that that rate may change over time, we skipped that very important first step. I don't understand that to be a response to the situation of the incumbents. Well, maybe I don't understand the question. Well, I heard from Mr. Ross that incumbents had already gotten FERC approved standby rates, if you will, 3 or 4 years before the current companies did, and that the Commission did not object. If I understand the question, we do not object to any of the affiliates, once they're formed, coming in and filing for preapproval of a formula rate. But they have to make that filing on a substantive basis. They can't rely on or have someone else's filing imputed to them in a non-substantive Section 205 filing. Is that responsive? Let me try a different way. Incumbent firms went through a proceeding like the present one, correct? And FERC approved these templates for them. You are referring to TransSource Kansas and CanStar as the incumbents? I'm referring to companies not present here. Okay, yeah. So incumbent transmission owners that currently have assets in search, certainly. Yeah. And did you object to that? Did you take the same position in the wake of that FERC decision that you're taking here? Well, the issue is different there. We certainly filed protests in several of those proceedings, and we filed Section 206 complaints in those proceedings. And I think you said earlier you were heard and your positions were accepted in that. In some instances they were and some were not. The key difference is that there was an actual entity making a filing there, and here we don't even know who these affiliates are. They're not yet formed. I'm not sure why you think that's material. I don't see how FERC can make, can engage in... If they approve a rate for an existing incumbent to be used in the future, then they approve a rate for an existing holding company to be used by forming a subsidiary in the future to use the rate. What is this distinction? Well, let me try to address it this way. So the reason that FERC said we don't need to have the 14 separate filings that counsel referred to was because they will be similarly situated. They will have the same parents. The joint intervener's brief demonstrates that there's no basis for that finding. In the corporate disclosure statements, they explain that TransSource Kansas is owned in part by Great Plains Energy, that CanStar is owned in part by Westar, and that Great Plains Energy and Westar are involved in a transaction where ownership of those entities will be combined. So what that means is at the time one of these not-yet-formed affiliates seeks to implement the rate that was previously approved, it's possible, if not highly likely, that that affiliate will have different parent companies at that time than TransSource Kansas and CanStar had at the time the rates were initially established under Section 205. What's the significance of that? Well, the significance of that is FERC's finding that there's no reason to litigate separate rates is because all of these entities will be the same. We demonstrated in our initial brief on pages 38 to 42 that we disagree with that. In what way will they be different? Just besides the fact that the names of the holding companies will be different. That's really the issue we have with FERC's findings here. We don't know how they will be different, and the Federal Power Act is structured in such a way that once they are formed and we know all of those facts, we can engage in a substantive discussion through a Section 205 case where we can hammer out all of those issues. Doesn't it seem like the better your argument gets on the merits, at least from understanding your argument, the better it gets on the merits because there's the possibility that these entities that come along can be differently situated. The worse it gets on standing because we don't know if that's ever going to happen precisely because there's that degree of uncertainty. Well, and I think the real issue, and we've cited the Alabama Municipal Distributors case in our brief, is whether the determinations are final and dispositive such that we would be precluded in the future from making these arguments. And without relief from the Court now, we would not have any opportunity to challenge the allocation of the burden of proof. So we're really addressing two issues, but I see harm either way. One is harm by the legal determinations, and then one is the speculation about what those entities may look like. That's harm to us as well because we just can't determine rates now for entities that we don't exist. And I would submit the answer, if you are sympathetic to the practical considerations, is while there is no current project, they could either submit 14 individual filings. But if that's burdensome, the answer is to do what FERC did in PJM and not start over, not start from scratch and recreate new formula rates, but allow these affiliates to come in and demonstrate substantively why replication is appropriate, that capital market conditions have not changed, that they are, in fact, similarly situated. That's the right answer, and FERC has never offered any meaningful explanation as to why or how the Federal Power Act supports the opposite answer in this case. All right. Thank you. Thank you.
judges: Henderson, Srinivasan, Ginsburg